Good morning, Your Honors. May it please the Court. Counsel, my name is Michelle Porro, and I'm here today on behalf of Farija Dulan. Probably the most distinguishing fact in this within the employer's chain of referral. Not one doctor that treated Ms. Dulan is a doctor that Ms. Dulan chose on her own. Who's Dr. Kim? Dr. Kim actually is a doctor with M&M Orthopedics, and she was sent originally to the Edward Emergency Room, then Edward Corporate Health. Edward Corporate Health then referred her to Dr. Kim, who's an orthopedic surgeon who specializes in knee and hip arthritis. Dr. Kim actually is someone that Edward Corporate Health had referred her to. In all of the medical records that were submitted, the only doctor actually that contradicted the findings and opinions of the doctors that treated Ms. Dulan was Dr. Suchi. And it's our opinion that the manifesto of the credible evidence that was submitted at the time of the trial supports the reversal of the Commission's decision. We find that the conclusion that Ms. Dulan's condition as of the date of hearing, that it was clearly apparent that her condition related to the April 25, 2009 work injury. Let me ask you this kind of question. We have the IME Dr. Suchi that obviously basically said the claim was magnifying her symptoms. He didn't think there was a causal connection, but he also cited and reviewed Dr. Kim, who noted that the MRI of the claimant's hip was essentially negative. The x-rays of the claimant's knee showed no signs of any significant arthritis or acute problem. X-rays and spine did not show any acute process. He did not see anything significant, quote, unquote, in the claimant's back, hip, or left knee. And so is it really fair to say that Suchi is the only one who would support the Commission's decision? He actually is a doctor that specializes in knee and hip issues, and he did refer her then to Dr. Palenkovic, who is a spinal specialist, and he's the only spinal specialist to actually examine Ms. Dulan, and he referred her to Dr. Voronov as well. And the findings with Dr. Palenkovic, actually, when he examined the MRI that was performed, he actually noted that she had left lower extremity radiculopathy, and he also noticed that she had left lateral recess stenosis that was an issue with her low back, and he also noted that on two occasions, both on July 9th of 2009 and when he saw her again on September 4th of 2009, that it correlated somewhat with the symptoms that she was having with the pain that was in her back that went down and radiated into her leg. You also have Dr. Oakley, who supports your side of the case, but again, in so many cases, you've got Oakley, you've got the other doctor, you've got Sushi and Kim. So why do you win the case? I think, actually, if you take a look at the videotape, actually, and look at that in conjunction. The surveillance video? Yeah. I don't know if you had an opportunity to review the surveillance video or not, but actually, the surveillance video, I think if you take a look at the timeline, it was actually performed with the medical treatment that she's had. She's been under pain treatment since the day that she originally went to Edward Corporate Health, and she's been provided with Vicodin and Demerol and Ibuprofen. As she continues to treat, Dr. Kim actually performed an injection into her knee on July 1st of 2009. He noted that the injection actually made her knee feel a little better when he saw her again on July 9th of 2009. That's the point at which he referred her off to Dr. Palenkovic and to Dr. Voronov. They also are within M&M Orthopedic. On July 20th, Palenkovic, like I said, noted that she had low back pain with left lower radiculopathy. And he noted that those changes correlated with the symptoms that she had on her MRI. The July 29th, Dr. Voronov, she gives her a Medrol dose pack. The Medrol dose pack is to reduce the inflammation. She's also taking at that time additional pain medication. On August 13th, when she sees Dr. Voronov, she gives her a second Medrol dose pack, which is somewhat unusual. Usually I only see one Medrol dose pack, and then they move on to injections. But because of Sushi's findings that she was malingering or exaggerating her symptoms. Actually, if you look at Dr. Sushi's report, he does not find that she had any positive Waddell signs when he saw her in December of 2009. And when she goes to see Dr. Okun, he specifically notes that she had no positive Waddell signs when he saw her in January of 2010. So he did, Dr. Sushi did say that he thought that she was perhaps magnifying her symptoms, but he didn't say that she did not have symptoms. And when she goes back to see Dr. Sushi in 2010, Dr. Sushi at that time actually found that he thought that she had, she probably should go back and have some additional diagnostic studies done. He didn't attribute that necessarily to her work injury that she had in April of 2009. But he also did indicate that she wasn't capable of going back to work in any capacity, whether it was for objective or subjective reasons. He himself would have kept her completely out of work. Now, Dr. Kim obviously doesn't help your side of the case, does he? Dr. Kim saw her two or three times for her knee, and I think her larger issue is her back, actually, when the radiculopathy and the stenosis that she is experiencing. So your argument is the superior credentials of your people to carry the data? My argument is I think that the manifest way of the evidence actually supports the finding that her problem that she had at the date that she testified related back to the April 25, 2009 date of injury. Thank you. Counsel, you may respond. Good morning, Justices. Counsel. Are you smiling today? I'm actually happy to be on this side today. Yesterday was a long day. This is a manifest way of the evidence case. The commission did its job. It weighed all of the evidence. It weighed the conflicting medical evidence, and it specifically looked at the credibility of the claimant. And that's really what's important here, because all of her treatment is about subjective pain complaints. And I appreciate counsel talked about her low back and her radiculopathy, but they did an EMG, which was normal. And honestly, when she got to Dr. Oken, the only thing she was really diagnosed with was chronic pain. And if you read the decision, the commission simply didn't believe her. She was asked on cross-examination specifically about her abilities to garden, to bend, to weed, to care for her grandchildren. She denied all of that. She said she was in horrible pain. She couldn't do any of those functions. And that up passed the surveillance? And up passed the surveillance showing that she's bending, that she's gardening, that she's weeding, that she's caring her child, I mean her grandchild. And the arbitrator and then the commission took specific note of that. They just said in their decision her subjective complaints far outweigh any objective findings. So is your argument that there's sufficient evidence in the record to support the commission's decision? Absolutely. And I think you were highlighting Dr. Kim. Dr. Kim repeatedly said her pain is really, really out of proportion with any of the objective testing. Dr. Sushi said the same thing, said it's symptom magnification. Her pain is, there's nothing objective. We can't find anything, there's nothing wrong with her, basically. And Dr. Oken does carry a different opinion. I mean, there's no question about it. But his entire opinion is based upon her subjective complaints to him regarding her pain. And I think she actually, when she went and saw Dr. Oken, gave a very specific history saying that she was unable to do any house cleaning, outdoor activities, shopping, gardening, exercising. You know, she specifically told all of that to Dr. Oken. And then obviously says the same thing at trial and in the surveillance video, so something very different. And that's really what the arbitrator and the commission saw. And I will tell you, they didn't make a specific credibility finding, but it was clear from their decision they didn't believe her. I mean, they just said her subjective complaints far exceed any objective findings. And all of the objective testing, she had several MRIs to her hip, one to her knee, one to her lower back, all normal. Other some degenerative findings for her lower back. And again, the EMG, which was normal for her, radicular pains. The commission looked at all of it. It weighed the evidence. They didn't believe the petitioner. And they found no causation. And I would say that the evidence in the record supports their finding. Thank you, counsel. Counsel, you may reply. With regard to the testimony as to whether she was able to bend over and do the gardening and various things like that, they were asking her that question in 2011. And what her testimony with the records actually reflect was that she had some temporary improvement with the MedDRAL dose pack, the pain medication and the anti-inflammatories that they were providing to her. Because she was getting not only the MedDRAL dose pack, but there's also Ultraset, there's, I can't remember the name of it. Well, her testimony was that at the time this surveillance tape was taken, that she was under treatment for pain management. Right. And she had some temporary improvement with the MedDRAL dose pack and the injections and the medication. But as time went on, if you take a look at the later videotape that was, I think, day four of the surveillance that they had. And interestingly, four days, eight hours a day, they came up with 26 minutes' worth of video of this lady. But when they do do the video in March of 2010, it actually does show her walking with an antalgic gait. She's not bending over. She's talking to her husband and pointing to stuff, but she's not actually bending over or doing anything. If the tape wasn't even entered into evidence, or did not, it wasn't, there wasn't a tape, could the Commissioner have decided the case the same way, looking at the physicians involved in this case? I think if you take a look at the manifest weight of the evidence, that the manifest weight of the evidence actually supports a finding in favor of the petitioner, Ms. Doolin. Thank you. Thank you, counsel. Thank you, counsel, both for your arguments in this matter. It will be taken under advisement and a written disposition shall issue. The court will stand in brief recess.